UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| TIMOTHY ADKINS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 15-133-ART |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| EXCEL MINING, LLC, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

Like many coal companies, Excel Mining has a zero-tolerance drug policy: no mining while on illegal drugs. So when one of its safety inspectors, Timothy Adkins, tested positive for a drug called oxazepam, Excel fired him. But Adkins claims that Excel fired him for a different, and discriminatory, reason—because he is an alcoholic. Adkins, however, has not provided sufficient evidence to support that claim. The Court must therefore grant summary judgment to Excel.

I.

For about three years, Timothy Adkins worked in Excel Mining's safety department. R. 46-2. As an Excel employee, Adkins agreed to a zero-tolerance policy that forbade him from working while under the influence of alcohol or illegal drugs—which included both recreational drugs and prescription drugs taken without a prescription. R. 46-4. The policy had one relevant exception: If an employee was taking prescription drugs and he disclosed

that to Excel, he could continue working as long as his doctor said it was safe to do so. R. 46-5 § 6.2. Otherwise, Excel could fire any employee who violated the policy. *Id.* § 1.2.

To enforce its zero-tolerance policy, Excel performed random drug tests on its employees. R. 46-7. One day, Excel made Adkins take the test. R. 46-14. And he failed, testing positive for both benzodiazepine (for which he had a prescription) and alcohol, two substances that—according to Adkins's healthcare providers—should not be mixed. *Id.*; *see also* R. 46-12 at 3. So the providers recommended that he stay home from work until the substances cleared his system. R. 46-19 at 2. After talking with the providers and getting Excel's permission, Adkins agreed to take leave and get in-patient treatment for alcohol dependency at Our Lady of Bellefonte Hospital. *Id.*; R. 46-20. While Adkins was at Bellefonte, doctors gave him several drugs, including Serax—a brand-name version of oxazepam, a prescription drug that treats anxiety and alcohol-withdrawal symptoms. R. 47-3 at 19−20. His treatment lasted for six days. *Id.* at 1.

But treatment led to more problems. After his release from Bellefonte, Adkins reported to work and met with Glennis Little, a nurse practitioner who provides healthcare services for Excel employees. R. 46-24. During this meeting, Adkins said that he had stopped all previous medications when he entered treatment. *Id.*; R. 46-25. He also told Little that the Bellefonte doctors gave him Zoloft, Lisinopril, B12, and Antabuse, and he gave Little his discharge papers from Bellefonte. R. 46-24. The papers confirmed what Adkins had said, but did not mention that Adkins had also taken Serax during treatment. R. 46-23.

Seven days after meeting with Little, Adkins took another drug test. R. 46-26. He again tested positive, this time for oxazepam (Serax). *Id.* After Little received the results, she wanted to make sure that Adkins's pre-treatment drug use did not cause the positive test result.

R. 46-25. So she called LabCorp (the company that actually performed the drug testing), and their toxicology doctors explained how long certain drugs stay in the body. *Id.* According to the doctors, oxazepam would clear a user's system within three days of taking it. R. 46-8 at 25−26. After speaking with LabCorp, Little notified Adkins that he had tested positive for oxazepam. R. 46-25. In response, he said, "Yeah, that's what I was on in Bellefonte." *Id.* Little then reported to Excel that Adkins had tested positive for a drug—one for which she believed he lacked a prescription, based on Little's understanding of Adkins's own recounting of his treatment, the Bellefonte discharge papers, and LabCorp's information. *Id.*

And so, the dominos fell. Excel fired Adkins for violating its drug policy. R. 46-27. To comply with Kentucky law, Excel disclosed Adkins's test results to the state Office of Mine Safety and Licensing. R. 46-29; *see* Ky. Rev. Stat. § 351.170 [*hereinafter* "KRS"]. The Office eventually suspended Adkins's mining certifications, R. 46-30, a decision he never appealed. Sometime after firing Adkins, Excel received the full copy of his medical records from Bellefonte, which indicated that the doctors had prescribed Serax (oxazepam) during his stay. R. 47-3 at 19−20. This information, however, did not motivate Excel to reconsider its decision. Relying on the information from Little and the LabCorp doctors, Excel concluded that any oxazepam Adkins took during his treatment at Bellefonte would have cleared his system before the drug test. R. 46-8 at 25−26. Thus, in Excel's view, Adkins must have taken drugs after treatment, in violation of company policy.

Left without a job or a mining certification, Adkins sued Excel in state court, and Excel removed the case here. R. 1. Adkins alleges that Excel fired him because he was an alcoholic. And that, he says, is unlawful discrimination that violates the Americans with Disabilities Act

(ADA), the Kentucky Civil Rights Act (KCRA),[1] and public policy.[2]  R. 1-1 ¶¶ 27–48.  He therefore seeks compensatory and punitive damages for lost income and emotional distress.  Excel now moves for summary judgment on all of Adkins's claims.  R. 46.

II.

Summary judgment is proper if the record, viewed in the light most favorable to the nonmoving party, reveals that there is "no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014); *see* Fed. R. Civ. P. 56(a).  To succeed, the moving party must first point out the issues that lack any genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986); *see* Fed. R. Civ. P. 56(c).  The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."  *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 861 (6th Cir. 1986); *see* Fed. R. Civ. P. 56(e).  The nonmoving party may not simply rest on his allegations; he must present "significant probative evidence" to support them.  *Gregg*, 801 F.2d at 861.  Simply put, if the nonmoving party fails to make a "sufficient showing" to establish an essential element of his case, the Court must grant summary judgment against him.  *Celotex*, 477 U.S. at 323.

A.

As an initial matter, Excel argues that Adkins cannot sue for discrimination under the ADA—because, in Excel's view—he is not disabled.  And, of course, the ADA protects only

---

[1] The language in the KCRA "mirrors the language" of the ADA.  So, Kentucky courts interpret the KCRA consistently with federal anti-discrimination law.  *See Brohm v. JP Props., Inc.*, 149 F.3d 517, 520 (6th Cir. 1998).  As such, the Court will treat Adkins's ADA and KCRA claims as one.

[2] Adkins also sued Excel for intentional infliction of emotional distress through outrageous conduct.  *See* R. 1-1 ¶¶ 49−57.  But upon Adkins's oral motion, the Court dismissed that claim.  R. 40 at 3.

4

individuals with disabilities. 42 U.S.C. § 12112(a). So to make a prima facie case of employment discrimination, a plaintiff must first show, among other things, that he does in fact have a disability. *Rosebrough v. Buckeye Valley High Sch.*, 690 F.3d 427, 431 (6th Cir. 2012). But there's one caveat. If, at the time of the alleged discrimination, the plaintiff was using illegal drugs and his employer fired him for that use, he cannot establish that he is an "individual with a disability" under the Act. *See* 42 U.S.C. § 12210(a) ("[T]he term 'individual with a disability' does not include an individual who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use."); KRS § 344.010(4) (excluding from the KCRA any person that the ADA excludes). In other words, an employer does not discriminate against an employee when it fires him for using illegal drugs.

Adkins claims that Excel fired him because he is an alcoholic. R. 1. True, alcoholism can qualify as a disability under the ADA. *See Mararri v. WCI Steel, Inc.*, 130 F.3d 1180 (6th Cir. 1997). But Excel argues that it fired Adkins because he was using oxazepam illegally, *i.e.*, without a prescription. R. 46 at 7, 15. If true, that argument is fatal to Adkins's claims under both the ADA and the KCRA. *See* 42 U.S.C. § 12210(a); KRS § 344.010(4). According to Excel, even though Bellefonte gave Adkins oxazepam during his stay, the drug would have cleared his system by the time he took the drug test—seven days after ending treatment. R. 46 at 15. And Excel has an expert witness, Dr. Timothy Allen, who confirms that claim. R. 46-41. Dr. Allen opines that neither the oxazepam nor any of the other prescription drugs that Adkins took at Bellefonte could have caused the positive drug test. *Id.*

But Adkins disagrees; he insists that the oxazepam from treatment was still floating around in his system. R. 47 at 23. In support, he says that he "was not an illegal drug user." *Id.* That statement, however, is rather self-serving, like saying "I didn't do it." And self-

serving statements are not persuasive on their own. *See McCray v. Metrish*, 232 F. App'x 469, 474 (6th Cir. 2007) ("[A] self-serving statement lacks the persuasive force of testimony by a disinterested witness."); *see also Carter v. George Washington Univ.*, 180 F. Supp. 2d 97, 111 (D.D.C. 2001) ("[S]elf-serving affidavits alone will not protect the non-moving party from summary judgment."). The only evidence that corroborates Adkins's theory is a short statement from Little. When asked in a deposition why the level of oxazepam in Adkins's system was lower in the second drug test (post-Bellefonte) than then in the first one (pre-Bellefonte), Little replied, "the longer you are off the medication, the more it decreases." R. 47-5 at 72. True, that statement helps Adkins's argument, as far as that argument goes: Maybe that statement shows that he did not take oxazepam right before his drug test, which, one could argue, makes it more likely that he took oxazepam while he was in treatment. R. 47 at 23.

But that argument does not reach many other questions, which are all just as—if not more important—to the suit: Was the oxazepam in his system the oxazepam that Bellefonte prescribed him? What amount did he take? When exactly did he take it? Little, by her own admission, cannot—and therefore does not—answer those questions. R. 46-8 at 93 ("I'm not real up to date on the half-life of medicine and how soon it should be out of the system or whatever."). Indeed, only someone with "scientific, technical, or other specialized knowledge" can testify about the metabolic rate of drugs. Fed. R. Evid. 701, 702. Adkins has no such witness.

Although Adkins presents no evidence contradicting Excel's expert testimony, the jury is still free to determine whether Dr. Allen is credible. *See Powers v. Bayline Marine Corp.*, 83 F.3d 789, 797–98 (6th Cir. 1996) (explaining that a jury can reject expert testimony even

6

when it is uncontradicted (citing *Quock Ting v. United States*, 140 U.S. 417, 420 (1891)). The Court must therefore be careful to avoid usurping the jury's role by making credibility determinations at this stage. *See, e.g.*, *Harris v. Gen. Motors Corp.*, 201 F.3d 800, 804 (6th Cir. 2000) (declining to "conclude [on summary judgment] that [a] defendant's experts' affidavits . . . [were] sufficiently unassailable to take the issue of credibility from the jury" (internal footnote omitted)). But the Court need not go so far because, as discussed below, there is a more fatal flaw in Adkins's case.

B.

Even assuming Adkins is disabled, Adkins must show how Excel discriminated against him. Under the ADA, two types of discrimination are unlawful: The first type is taking action *against* an employee—such as firing him—because he has a disability. 42 U.S.C. § 12112(a). The second type is failing to take an action *for* him—i.e., failing to take steps to accommodate an employee's disability. *Id.* § 12112(b)(5)(A); *see Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 201 (6th Cir. 2010). Here, Adkins alleges both types. To hold Excel liable, he only needs to prevail on one.

i.

Adkins first argues that Excel fired him because he was an alcoholic. To establish a prima facie case of unlawful discrimination under the ADA, a plaintiff must show that he was disabled, but otherwise qualified for the position, and that the employer—knowing of the disability—took an adverse employment action against him. *Rosebrough*, 690 F.3d at 431.

Even if a plaintiff can establish his prima facie case, the employer does not automatically lose. Instead, the burden shifts to the employer to articulate a legitimate, nondiscriminatory motive for firing the plaintiff. *See McDonnell Douglas Corp. v. Green*, 411

U.S. 792, 802 (1973); *Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 310 (6th Cir. 2000). If the employer produces that motive, the burden then returns to the plaintiff to prove that the employer's stated motive is merely pretext for unlawful discrimination. *McDonnell Douglas*, 411 U.S. at 804; *Parry*, 236 F.3d at 310.

Here, even assuming that Adkins could establish his prima facie case, Excel says it had a legitimate, nondiscriminatory motive: Excel fired him because he violated the zero-tolerance drug policy, not because he was an alcoholic. R. 46 at 18. A review of the record confirms that motive: First, Excel's alcohol and drug policy clearly prohibits employees from working while using illegal drugs, including prescription drugs taken without a prescription. R. 46-5 §§ 1.2, 5. The policy goes on to require any employee using a prescription drug to disclose that use to human resources. *Id.* § 6.2. If the employee violates the policy, Excel may fire him. *Id.* § 1.2 ("An employee who has a confirmed, positive drug or alcohol screening result will be terminated."). Second, LabCorp's results from Adkins's drug test indicate that he had oxazepam in his system. R. 46-26. And although the Bellefonte doctors had prescribed Adkins oxazepam during treatment, the LabCorp doctors told Little that the prescribed oxazepam would have cleared Adkins's system by the time he took the drug test. Third, when Excel management documented Adkins's termination, a supervisor said the company fired him because he failed a drug test. R. 46-27.

The violation of a company drug or alcohol policy is a legitimate, nondiscriminatory reason for firing an employee, particularly where that violation creates a safety hazard. *See, e.g.*, *Blazek v. City of Lakewood*, 576 F. App'x 512, 516 (6th Cir. 2014) (upholding an employer's termination of an employee who "possess[ed] and consum[ed] alcohol in the workplace"); *Martin v. Barnesville Exempted Village Sch. Dist. Bd. of Educ.*, 209 F.3d 931,

8

935 (6th Cir. 2000) ("The ADA does not protect plaintiff from his own bad judgment in drinking on the job. . . . Any suggestion to the contrary is absurd on its face."). And that makes sense—the ADA does not require companies to employ people who "run the risk of an accident" by drinking or using drugs on the job. *Martin*, 209 F.3d at 935. Taken together, the evidence shows that the company fired Adkins because he failed the drug test, in violation of company policy. So Excel has carried its burden to produce a legitimate reason for firing Adkins.

The burden therefore returns to Adkins to prove that Excel's explanation is pretextual, *i.e.*, that Excel truly fired him because he is an alcoholic. Adkins makes three arguments as to why Excel's stated motive "was not the actual reason" for firing him. *See Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391 (6th Cir. 2009).

Adkins first asserts that Excel offered two different reasons for his termination, casting doubt on each. R. 47 at 27. On a form it submitted to the state unemployment office, Excel stated that it fired Adkins because he "[f]ailed [a] urine drug screen." R. 47-26 at 4. Later, the form asks, "[w]hat explanation did [Adkins] provide regarding the incident?" *Id.* at 4. Excel replied, "He did not disclose til results came back. Said he forgot." *Id.* Adkins argues that these two statements—that Adkins failed his drug test and that he did not timely disclose that Bellefonte had given him Serax during treatment—are so different that neither can be Excel's actual reason for firing him. R. 47 at 27.

True, flip-flopping can be evidence of pretext. *See Gaglioti v. Levin Grp., Inc.*, 508 F. App'x 476, 481 (6th Cir. 2012); *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996). But Excel did not flip-flop here. On the unemployment form, Excel gave only one reason for Adkins's termination: the failed drug test. Excel's later statement merely describes

what Adkins himself said, as the form prompted Excel to do. Taking these words out of context does not create a genuine issue of material fact. Throughout the entire process, Excel "never abandon[ed]" its reason for firing him. *See Gaglioto*, 508 F. App'x at 481. Thus, Adkins's first argument fails.

Second, Adkins alleges that the timing of his termination is suspicious, undermining Excel's stated motive. R. 47 at 28. In his view, the fact that Excel fired him soon after he left treatment shows that it fired him because of his alcoholism. *Id.* But temporal proximity cannot be the "sole basis for finding pretext." *EEOC v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015). This case shows why that is. Yes, Excel fired Adkins soon after he left treatment. But Excel also fired him soon after he took—and failed—a drug test. In fact, his termination was closer to the drug test than to his treatment. Were the Court to rely on Adkins's timing argument, that argument makes Excel's view more likely. And, of course, that is not what Adkins means to argue. Temporal proximity cannot prove that Excel's proffered explanation was not the real one. Thus, Adkins's second argument also fails.

Finally, Adkins argues that Excel could not have fired him for using oxazepam without a prescription because, the record shows, the Bellefonte doctors gave him the drug during treatment. R. 47 at 27; R. 47-3 at 19–20 (medical records). As discussed above, the parties dispute whether the oxazepam in his system was the oxazepam that the doctors gave him. But that dispute does not bear on whether Excel's explanation was pretext.

If Excel "honestly believed" that Adkins violated the company drug policy, then its explanation was not pretext, regardless of whether he actually did. *See Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998). To establish an honest belief, an employer must show that it made "a reasonably informed and considered decision" before terminating an

employee. *Id.* at 807. Even if the employer's belief turns out to be "mistaken, foolish, trivial, or baseless," if it was honest, then it was not pretext. *Id.* at 806.

Here, Excel made an informed and considered decision. After reviewing the test results, Little called LabCorp to get more information. The LabCorp doctors, who had toxicology expertise, advised her that oxazepam would clear Adkins's system within three days of taking it. Seven days passed between the end of treatment and the drug test. So, according to LabCorp's information, any oxazepam from Bellefonte would have cleared his system. Relying on that information—and Adkins's treatment discharge papers (which did not even mention oxazepam)—Excel decided to terminate him.

Adkins would argue that his statement to Little—"Yeah, that's what I was on in Bellefonte," R. 46-25—should by itself have led Excel to change its termination decision. But Excel was not required to. Excel was only required to make an informed and considered decision based the facts before it. In making that decision, Excel did not have to take Adkins's vague statement over the word of the LabCorp healthcare professionals, as Adkins would have preferred. *See, e.g.*, *Bailey v. Real Time Staffing Servs.*, 543 F. App'x 520, 524 (6th Cir. 2013) (reasoning that an employer's decision to "credit the medical review officer[]" over the plaintiff's story "does not support an inference of discriminatory animus"). Thus, Adkins's third argument fails.

In sum, Adkins does not present sufficient evidence to show that Excel fired him for any reason other than the one it provided—that Excel believed he was using an illegal drug. As such, the Court must grant summary judgment to Excel on Adkins's first discrimination claim.

ii.

Next, Adkins argues that Excel discriminated against him when it failed to reasonably accommodate his disability. R. 1-1 ¶¶ 31–34, 43–45. To succeed on that type of disability claim, Adkins must show, among other things, that he requested a reasonable accommodation for his known disability and that Excel failed to provide one. *See Gaines v. Runyon*, 107 F.3d 1171, 1175−76 (6th Cir. 1997); *see also Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982–83 (6th Cir. 2011) (applying the *Gaines* framework to the ADA). If he never made that request, his claim "must be dismissed." *Johnson*, 443 F. App'x at 983. Adkins alleges that Excel twice failed to accommodate his alcoholism.

First, Adkins says that he requested an accommodation to attend treatment for his alcoholism, and that Excel terminated him for that treatment. R. 47 at 29. But the record shows that he never requested treatment on his own. In his own words, Excel "set up" the treatment for him. R. 47 at 8. After Adkins failed the first drug test, R. 46-14, he met with Little and another Excel-affiliated doctor, Dr. Wells. R. 46-19. Dr. Wells recommended that Adkins enter in-patient substance-abuse treatment, *id.* at 2, and Excel agreed, R. 46-21 ("We are going to send him for Treatment of Alcohol. We informed him no more problems once he finished the program[.]"). The next day, Adkins entered treatment. R. 46-20 (Bellefonte admission form). When he finished, he returned to work. R. 46-23; R. 46-24. Seven days later, he took and failed another drug test. R. 46-26. This chain of events lacks one link that Adkins needs to prove—a request. Even if his agreement to enter treatment could constitute a request, Excel approved it. *See* R. 46-21. Moreover, as discussed above, Adkins has not shown that Excel fired him for undergoing the treatment it told him to undergo. Thus, his first failure-to-accommodate argument fails.

Second, Adkins seems to argue that Excel failed to accommodate his disability after he failed the second test. R. 47 at 29–30. In support of this argument, he cites Sixth Circuit precedent requiring employers to use "interactive process[es]" to come up with reasonable accommodations. *See Ford*, 782 F.3d at 753; *Keith v. Cty. Of Oakland*, 703 F.3d 918, 929 (6th Cir. 2013); *see also* 29 C.F.R. § 1630.2(o)(3). According to Adkins, Excel needed to discuss possible accommodations with him after he failed the drug test.

But again, Adkins skips a step. An employer is required to come up with an accommodation, only if the employee first asks for one. *See Keith*, 703 F.3d at 927 ("When accommodation is necessary . . . , it is the plaintiff's burden to propose an accommodation[.]"); *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046 (6th Cir. 1998) ("There is no question that the EEOC has placed the initial burden of requesting an accommodation on the employee."). Adkins never did. What he did say after the drug test—"Yeah, that's what I was on in Bellefonte," R. 46-25—was an explanation, not a request. Those words do not propose any accommodation to or ask any accommodation of Excel. Nor do they give Excel sufficient notice as to what accommodations Adkins's disability might require. Excel was not required to "speculate." *See Gantt*, 143 F.3d at 1046. So this argument fails as well.

For Excel to have failed to accommodate his disability, Adkins must have requested an accommodation. Because he did not, his failure-to-accommodate claim fails. The Court must therefore grant summary judgment to Excel on Adkins's second discrimination claim.

B.

Finally, Adkins alleges that his discharge violated public policy. In Kentucky, employment is usually terminable at will, meaning that an employer can fire an employee for a good reason, a bad reason, or no reason at all. *See, e.g.*, *Firestone Textile Co. Div. v.*

*Meadows*, 666 S.W.2d 730, 731 (Ky. 1983). But there is an exception: A plaintiff may contest his firing if it violated a specific and clear public policy. *See, e.g.*, *Grzyb v. Evans*, 700 S.W.2d 399, 400–01 (Ky. 1985). That public policy "must be evidenced by a constitutional or statutory provision." *Id.* at 401.

But there is an exception to the exception. An employee cannot sue under public policy if a statute already provides a cause of action and relief for his claim. *Id.* ("Where the statute both declares the unlawful act and specifies the civil remedy available to the aggrieved party, the aggrieved party is limited to the remedy provided by the statute."). This is such a case. Adkins argues that his firing violates the ADA, the KCRA, and public policy. The policy he cites? The KCRA—which provides both a cause of action and a remedy for disability discrimination. KRS §§ 344.100, 344.450. Because it does both, the KCRA is the proper—and only—avenue for Adkins's claim. *See Grzyb*, 700 S.W.2d at 401 (explaining that the KCRA defines employment discrimination and structures the remedy, thus "preempt[ing] the field of its application").

Plus, there is another public policy at play here: safety. In coal mining, safety is the first priority. Ensuring that miners are not using drugs or alcohol is an important interest, which Excel has the discretion—and a duty—to uphold. Kentucky public policy does not undermine that interest; Kentucky public policy bolsters that interest. So Adkins's argument fails, and the Court must grant Excel summary judgment on Adkins's public-policy claim.

III.

Adkins alleges that Excel fired him because he is an alcoholic. But the evidence shows that Excel fired him because he tested positive for a drug that, Excel believed, he was taking without a prescription, in violation of Excel's zero-tolerance drug policy. Adkins has failed to

14

show a genuine issue of material fact as to Excel's version of the story. The Court must therefore grant summary judgment to Excel Mining.

Accordingly, it is **ORDERED** as follows:

(1)  Excel's motion for summary judgment, R. 46, is **GRANTED**.

(2)  Adkins's complaint, R. 1-1, is **DISMISSED WITH PREJUDICE** with respect to all issues raised in this proceeding.

(3)  This action is **STRICKEN** from the Court's active docket.

(4)  All pending motions are **DENIED AS MOOT** and all hearings are **CANCELLED**.

(5)  A separate judgment shall issue with this Order.

This the 4th day of October, 2016.

Signed By:
*Amul R. Thapar* AT
United States District Judge